**NATIONAL RIFLE ASSOCIATION OF AMERICA, et al., Plaintiffs,**

**v.**

**J. Craig POTTER, Acting Assistant Secretary for Fish and Wildlife and Parks, et al., Defendants.**

**Civ. A. No. 84–1348.**

United States District Court, District of Columbia.

Feb. 24, 1986.

Stephen N. Shulman, Washington, D.C., for plaintiffs.

Frank E. McAnear, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

In this action for declaratory and injunctive relief plaintiff National Rifle Association of America ("NRA") and plaintiff-intervenor Wildlife Legislative Fund of America ask the Court to set aside a certain regulation promulgated under the aegis of the Secretary of the Interior which prohibit hunting and trapping in the National Park System except where specifically contemplated by Congress.[1] Upon consideration of cross-motions for summary judgment—the principal legal issue being the accuracy of the Secretary's divination of legislative intent and the material facts largely matters of history—the Court finds that the regulation is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706, and defendants' motions for summary judgment will, accordingly, be granted and that of plaintiff denied.[2]

1. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 2201 (1982); review is in accordance with the Administrative Procedure Act ("APA") 5 U.S.C. § 701 et seq. (1982 & Supp. II 1985).

2. Named Defendants are J. Craig Potter, Acting Assistant Secretary for Fish and Wildlife and

## I.

The first national park, Yellowstone, was created by Congress in 1872 as a "public park or pleasuring ground for the benefit and enjoyment of the people." 16 U.S.C. § 21 (1982). By 1916, 13 national parks and 19 national monuments had been established, responsibility for their administration, however, having been dispersed among a number of government agencies, including the Departments of Interior, Agriculture and War. To provide more cohesive management for this expanding corpus of publicly-owned repositories of the nation's natural and historic heritage, Congress in that year created the National Park Service ("NPS"), whose mission, it said, was:

> [To] promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified ... by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1 (1982) (hereinafter, the "Organic Act"). The Secretary of the Interior was authorized to "make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks...." 16 U.S.C. § 3 (1982). Although the Secretary was permitted in his discretion to provide "for the destruction of such animals and of such plant life as may be detrimental to the use of any of said parks, monuments, or reservations," *id.*, the paramount objective of the park system with respect to its indigenous wildlife, and the philosophy which came to pervade the new Park Service to whom it was entrusted, was, from the be-

ginning, one of protectionism. Witness an early directive from the Secretary of the Interior to NPS' first director: "[h]unting will not be permitted in any national park." Administrative Record ("A.R.") Doc. 1 at 70.

Beginning in the late 1930's, Congress began to add to the system a number of "nontraditional" park areas, such as national seashores, lakeshores and scenic riverways, in many of which Congress itself specifically undertook to authorize hunting, trapping and fishing as permitted recreational activities. In the 1960's, in recognition of the heterogeneous character of the territories it was now overseeing, the Park Service evolved on its own a concept of "management categories" as a means to differentiate the administration required for them. Under the new taxonomy, outlined in a memorandum in July of 1964 from then-Secretary of the Interior Udall to the Director of the Park Service, the park system was divided into three categories— natural, historical and recreational—with the policies for their governance to reflect the nature of the areas and the uses to which they had historically been put. *See* A.R. Doc. 6. Thus, in the case of recreation areas, which had traditionally accommodated multiple uses, the Park Service began to allow hunting, trapping and fishing on its own initiative if otherwise in accordance with federal, state and local laws. *See* A.R. Doc. 9 at 32; 31 Fed.Reg. 12,750, 12,754 (1966).

Two subsequent amendments to the Organic Act, however, caused the Park Service to doubt the extent of its autonomy in the matter. In a 1970 amendment, known as the General Authorities Act, 16 U.S.C. §§ 1a–1, 1c (1982), Congress declared:

> [T]hat the national park system, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic,

Parks, Department of the Interior, and the National Park Service. Defendant-intervenors are the National Parks and Conservation Association, Defenders of Wildlife, the Humane Society of the United States, the Wilderness Society, and the Sierra Club. All parties except plaintiff-intervenor Wildlife Legislative Fund of America have filed motions for summary judgment, defendant-intervenors filing jointly.

and recreation areas in every major region of the United States ...; that these areas, though distinct in character, are united through their inter-related purposes and resources into one national park system as cumulative expressions of a single national heritage; ... and that *it is the purpose of this Act to include all such areas in the System and to clarify the authorities applicable to the system.*

16 U.S.C. § 1a–1 (emphasis added). The Act continued: "[e]ach area within the national park system shall be administered in accordance with the provisions of any statute made specifically applicable to that area," as well as any other applicable authorities, "including, but not limited to the [Organic Act]." 16 U.S.C. § 1c (1982). Eight years later, in a rider to the Redwood National Park Expansion Act, Pub.L. No. 95–250, 92 Stat. 163, Congress reiterated its intention that:

> [T]he promotion and regulation of the various areas of the National Park System ... shall be consistent with and founded in the purpose established by [the Organic Act], to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, *except as may have been or shall be directly and specifically provided by Congress.*

16 U.S.C. § 1a–1 (emphasis added). Perceiving in these amendments an implied reproof for having strayed from the true purpose of the Organic Act (and, specifically, for its "management categories" system), NPS concluded that Congress conceived of the park system as an integrated whole, wherein the Park Service was to permit hunting and trapping only where it had been specifically authorized, or discretion given it to do so, by Congress in the applicable enabling act. *See* A.R. Doc. 40; NPS Management Policies (1975), A.R. Doc. 18 at I–3; NPS Management Policies (1978), A.R. Doc. 19 at I–3.

Shortly thereafter NPS began the task of revising its regulations to bring them into harmony with the revealed congressional will by abandoning the "management categories." Proposed regulations were first published in the Federal Register on March 17, 1982, 47 Fed.Reg. 11,598 (1982), and, after consideration of the comments received, final regulations, including that presently in dispute, were published on June 30, 1983, to take effect on October 3, 1983. 48 Fed.Reg. 30,252 (1983).[3] The contested regulation reads as follows:

> § 2.2 Wildlife protection.
>
> (a) The following are prohibited:
>
> (1) The taking of wildlife, except by authorized hunting and trapping activities conducted in accordance with paragraph (b) of this section.
>
> . . . . .
>
> (b) *Hunting and trapping*
>
> (1) *Hunting shall be allowed in park areas where such activity is specifically mandated by Federal statutory law.*
>
> (2) Hunting may be allowed in park areas where such activity is specifically authorized as a discretionary activity under Federal statutory law if the superintendent determines that such activity is consistent with public safety and enjoyment, and sound resource management principles. Such hunting shall be allowed pursuant to special regulations.
>
> (3) *Trapping shall be allowed in park areas where such activity is specifically mandated by Federal statutory law....*
>
> (4) Where hunting or trapping or both are authorized, such activities shall be

---

**3.** Implementation of the hunting regulation was delayed three times, *see* 48 Fed.Reg. 43,174 (Sept. 22, 1983); 48 Fed.Reg. 54,977 (Dec. 8, 1983); 49 Fed.Reg. 7,125 (Feb. 27, 1984), but they finally took effect on April 30, 1984. The trapping regulation was also delayed until January 15, 1985, at the request of trapping supporters, to allow Congress to act on proposed legislation specifically authorizing trapping in certain areas, but the legislation was never passed.

conducted in accordance with Federal law and the laws of the State within whose exterior boundaries a park area or a portion thereof is located. Nonconflicting State laws are adopted as a part of these regulations.

. . . . .

36 C.F.R. § 2.2 (1985) (emphasis added).[4]

## II.

Plaintiff NRA filed this action on April 30, 1984, contending that the regulation arbitrarily and capriciously reverses a by-now venerable, and beneficent, Park Service policy of permitting hunting and trapping in recreational areas of the park system in the sound, i.e., conservation-conscious, discretion of individual park superintendents, and that no express congressional command is, or has ever been, necessary to empower it to do so.[5] Defendants respond that the philosophy of the Park Service, since its first expression in the Organic Act, has always been exclusively protectionist; that hunting and trapping have never been permitted in traditional parks and monuments; and that, while the Service may have succumbed to error in the late 1960's and 1970's, it has now acted to restore itself to grace by conforming its policy to a constant congressional intent of which it was pointedly reminded by the 1970 and 1978 amendments to the Organic Act.

### Standing

At the threshold the Court must determine whether plaintiff NRA has standing to bring this action, either on its own behalf or as the representative of its members. It is now familiar learning that Article III requires a plaintiff to show that it has suffered some actual or threatened injury as a result of the defendant's allegedly illegal conduct, that its injury is fairly traceable to the challenged action, and that it is likely to obtain redress by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). *See also Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607–1608, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). In addition, the plaintiff must satisfy the so-called "prudential"

---

**4.** The regulations apply to all 338 units of the National Park System (including four areas administered by the Park Service under cooperative agreements with other agencies), of which 44 are considered recreation areas. *See* 36 C.F.R. § 1.2(1) (1985). Of these, 40 were established by federal enabling acts, 31 of which expressly permit hunting, and three of which leave the matter to the Secretary's discretion. Six units have enabling acts which are silent as to hunting: Padre Island National Seashore, Cuyahoga National Recreation Area, Golden Gate National Recreation Area, Indiana Dunes National Lakeshore, Santa Monica Mountains National Recreation Area, and Chattahoochee River National Recreation Area. In one of these, Padre Island National Seashore, the Park Service permits hunting because it reads the legislative history to evince Congress' intent to allow it. In another, Chattahoochee River National Recreation Area, hunting is not permitted, but plaintiff concedes that the legislative history indicates Congress' intent to prohibit it.

There are 11 recreation areas whose enabling acts are silent as to trapping: Assateague Island National Seashore, Bighorn Canyon National Recreation Area, Buffalo National River, Cape Cod National Seashore, Delaware Water Gap National Recreation Area, John D. Rockefeller, Jr. Memorial Parkway, New River Gorge National River, Ozark National Scenic Riverways, Pictured Rocks National Lakeshore, Saint Croix National Scenic Riverway, and Sleeping Bear Dunes National Lakeshore.

**5.** The predecessor regulation read, in pertinent part:

(a) *In natural and historical areas and national parkways.*

(1) The hunting, killing, wounding, frightening, capturing, or attempting to kill, wound, frighten, or capture at any time of any wildlife is prohibited, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury.

. . . . .

(b) *In recreational areas (except national parkways).*

(1) Except as otherwise provided herein, hunting and trapping are permitted in accordance with all Federal, State and local laws and regulations applicable to these areas or portions thereof....

36 C.F.R. § 2.32 (1982).

requirement, viz., that its asserted interests "fall within the 'zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Association of Data Processing Service Organization v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)); *accord, American Friends Service Committee v. Webster*, 720 F.2d 29, 49–52 (D.C.Cir.1983); *FAIC Securities, Inc. v. United States*, 768 F.2d 352, 356–57 (D.C.Cir.1985).

■ An organization has standing to sue in its representational capacity when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

The NRA asserts without contradiction that it is a not-for-profit organization with approximately three million members, many of whom are hunters and trappers who would like to pursue their avocations in the areas affected by the offending regulation. *See* Affidavits of James M. Norine, Director of Hunter Services, NRA. The Association's by-laws state that the purpose of the organization is "to promote hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth, conservation, and wise use of our renewable wildlife resources." First Aff. of James M. Norine at 2.[6] Plaintiff contends that its members have suffered injury both in their inability to hunt and trap in the now-proscribed areas, and in their loss of the opportunity to convince individual park superintendents of the desirability of permitting hunting and trapping where those superintendents formerly had discretion to do so.[7] The NRA reminds that regulations governing the park system should endeavor to accommodate the interests of *all* Americans in a safe and enjoyable National Park System, of whom hunters and trappers, too, must be numbered and, thus, fall within the relevant "zone of interests."

■ The Court concludes that the NRA does have standing to pursue this action in its representational capacity.[8] NRA members have suffered a specific injury which is traceable to the federal defendants' actions and would be redressed by a favorable decision.[9] Furthermore, the interests of its members are indisputably within the zone of interests protected by the regulations, namely, the right of all citizens to use the national parks in any manner consistent with the congressional mandate.

*Review of Agency Action*

■ The Court of Appeals for this circuit has recently restated the analysis to be undertaken in determining whether agency action conforms to law:

"If the intent of Congress is clear, *that is the end of the matter;* for the court, as well as the agency, must give effect

---

6. Plaintiff also asserts that it represents the interests of trappers, as evidence of which it tenders its 1974 resolution endorsing trapping "as a legitimate use of our renewable wildlife resources when carried out by methods which are in full compliance with existing laws."

7. As an example plaintiff cites the Cuyahoga Valley National Recreation Area which had previously been the subject of a study as to the feasibility and desirability of permitting hunting therein. The effect of the new regulation, however, is to foreclose absolutely the Park Service's discretion to permit hunting notwithstanding an eventual favorable determination.

8. It need not, therefore, decide whether plaintiff has standing to sue in its own right.

9. It is well-established that the injury need not be economic in nature to satisfy Art. III requirements. *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

to the unambiguously expressed intent of Congress." If, however, "the statute is silent or ambiguous with respect to the specific issue," we are not to give effect to our own estimation of intent, but must accept the agency's if it is "based on a permissible construction of the statute." A "permissible construction" has been helpfully defined as one that is "sufficiently reasonable to be accepted by a reviewing court."

*FAIC Securities, Inc. v. United States,* 768 F.2d at 361 (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981)) (emphasis in original). The reviewing court is, thus, forbidden to substitute its judgment for that of the agency, but must consider only " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971)), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1341, 43 L.Ed.2d 433 (1975). *See also Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694.

In the instant case, it is the intent of Congress, as expressed in the Organic Act, the amendments, and the enabling acts creating the individual park units, which is to be ascertained. Specifically, the Court must determine whether the Park Service has made a "permissible construction" of them as precluding hunting and trapping unless Congress says otherwise, or whether, as plaintiff argues, the absence of a direct prohibition should be construed as authorizing the Secretary to exercise his own good judgment in the matter.

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). The Organic Act directs the Park Service to promote and regulate the use of the national parks "by such means and measures as conform to [their] fundamental purpose ... *which purpose is to conserve the scenery and the natural and historic objects and the wild life therein* and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1 (emphasis added). Plaintiff contends that this language is certainly not inconsistent with properly regulated hunting and trapping, while defendants argue that "conservation" of wildlife means just that: safeguarding it from harm, whether from natural or human causes.

Although the language of the Organic Act, standing alone, may not be plainly inconsistent with the concept of limited hunting and trapping, plaintiff's interpretation of it is nevertheless inconsistent with that principle of statutory interpretation known as *expressio unius est exclusio alterius,* i.e., that omissions from enumerated specifics are generally presumed to be deliberate exclusions from the general unless otherwise indicated. *See* Sutherland, *Statutes and Statutory Construction* § 47.23 (1984). In the Organic Act Congress speaks of but a single purpose, namely, conservation; and the fact that Congress thereafter saw fit in the various acts creating individual units of the Park System to authorize hunting and/or trapping expressly (or to leave such matters to NPS' discretion)[10] leads to a supposition that it expected that they would not be allowed to take place elsewhere.

---

**10.** *See, e.g.,* 16 U.S.C. § 460n–4 (1982) (hunting and trapping shall be permitted in Lake Mead National Recreational Area); 16 U.S.C. § 460m–20 (1982) (Secretary "may permit hunting and fishing" in New River Gorge National River); 16 U.S.C. § 460m–10 (1982) (Secretary "shall permit hunting and fishing" in Buffalo National River); 16 U.S.C. § 460q–4 (1982) (Secretary "shall permit hunting and fishing" in Whiskeytown-Shasta-Trinity National Recreation Area).

It may also be significant that section three of the Organic Act permits the Secretary to "provide in his discretion for the destruction of such animals and of such plant life as may be detrimental to the use of any ... parks, monuments, or reservations." 16 U.S.C. § 3. Had Congress intended section one of the Act to allow the Secretary discretion to permit hunting and trapping—certainly a most efficient form of destruction of undesirable wildlife—it would hardly have been necessary to grant him specific authority elsewhere to destroy for purpose of preventing "detriment." Finally, in its 1978 rider to the Redwood National Park Expansion Act, Congress reiterated its intention that the National Park System be administered in furtherance of the "purpose" (not "purposes") of the Organic Act, that being, of course, the conservation of, *inter alia*, wildlife resources. *See* 16 U.S.C. §§ 1a–1, 1c.

Nonetheless, if the statutory language may still be thought to be inconclusive (which it may in truth be; Congress is surely able to say "no hunting or trapping" in the park system unless it ordains) the Court must therefore turn to other sources, including the legislative histories of the various acts, for such light as they may shed on the issue.

Although the legislative history of the Organic Act itself is not teeming with references to the taking of fauna, such as there are lead to the conclusion that Congress did not contemplate any so-called "consumptive" uses of the new park system it was creating. For example, there is a House Report that states that the overriding purpose of the bill was to preserve "nature as it exists." H.Rep. No. 700, 64th Cong., 1st Sess. 3 (1916). Another speaks of a unit of the park system as a "game preserve," *see* H.Rep. No. 1763, 53d Cong., 3d Sess. 2 (1895). Then again, the act creating Yellowstone directed the Secretary to "provide against the wanton destruction of the fish and game found within

the park, and against their capture or destruction for the purposes of merchandise or profit." 16 U.S.C. § 22 (1982). Subsequent legislation, enacted in response to a series of buffalo-poaching incidents in Yellowstone, imposed criminal penalties for hunting or other killing of animals or birds, except in self-defense. *See* 16 U.S.C. § 26 (1982); H.Rep. No. 658, 53d Cong., 2d Sess. 1 (1894); Sen.Rep. No. 295, 53d Cong., 2d Sess. 1–2 (1894).[11]

Moreover, the interpretations given the Organic Act and the first enabling acts by those officials initially charged with their implementation in the early days of the park system reveals that they understood hunting and trapping were not to be permitted. Secretary of the Interior Franklin Lane emphasized in a 1918 memo to the first director of the Park Service that "[h]unting will not be permitted in any national park." A.R. Doc. 1 at 70. In 1925, Secretary Work used similar language in a directive to the then-director, noting that Mount McKinley National Park was a lone exception to the no-hunting rule because its own enabling act said otherwise. A.R.Doc. 2 at 74. Secretary Work emphasized that "[t]he duty imposed upon the National Park Service in the organic act creating it to faithfully preserve the parks and monuments for posterity in essentially their natural state is paramount to every other activity," *id.* at 72, and he contrasted the consumptive resource management philosophy of the Forest Service with NPS policy. "Hunting is permitted in season in national forests but never in the national parks, which are permanent game sanctuaries. In short, national parks unlike national forests, are not properties in a commercial sense, but natural preserves for the rest, recreation and education of the people. They remain under Nature's own chosen conditions." *Id.* at 75. In fact, the first official regulations ever promulgated by the Park Service declared that "parks and monuments are sanctuaries for wildlife of every sort, and

---

**11.** Similar statutes imposing penalties for hunting and trapping in other national parks followed. *See, e.g.,* 16 U.S.C. §§ 60, 63, 98, 117c, 127, 170, 198c, 204c, 256b, 395c, 403c–3, 403h–3, 404c–3 and 408k (1982).

all hunting, or the killing, wounding, frightening, capturing, or attempting to capture at any time of any wild bird or animal ... is prohibited...." 1 Fed.Reg. 673–74 (1936). It is a well-recognized principle of statutory construction that contemporaneous interpretations of dated legislation are ordinarily given considerable deference when its meaning is later questioned. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933); *State of Oklahoma v. Schweiker,* 655 F.2d 401, 416 (D.C.Cir. 1981); *Lenkin v. District of Columbia,* 461 F.2d 1215, 1227 (D.C.Cir.1972).

The language and legislative histories of the several enabling acts creating park areas which are "silent" as to hunting are similarly subversive of plaintiff's position. For example, the enabling act for the Padre Island National Seashore says nothing with respect to hunting, but it does state that the Organic Act governs its administration, "except that authority *otherwise available* to the Secretary for the conservation and management of natural resources may be utilized to the extent he finds such authority will further the purposes" of the enabling act. 16 U.S.C. § 459d–4 (1982) (emphasis added). The accompanying Senate Report states that the "otherwise available" language was seen to give the Secretary authority to permit hunting, and so the Park Service allows it. S.Rep. No. 1226, 87th Cong., 2d Sess. 11 (1962). Comparable language appears in the committee report for the Cuyahoga Valley National Recreation Area, H.Rep. No. 1511, 93rd Cong., 2d Sess. 10 (1974), and the NPS is, accordingly, considering permitting hunting there. A.R. Doc. 40 at 4.

There is no such permissive language to be found in any of the enabling acts of the other recreation areas, however, and their legislative histories do not imply the same congressional-tolerance towards hunting and trapping in them. The committee report for Golden Gate National Recreation Area, for example, stresses the need for expanded outdoor recreation opportunities but makes no mention of hunting, or any "otherwise available" authority of the Secretary. H.Rep. No. 1391, 92d Cong., 2d Sess. 2 (1972). The House Report on the Indiana Dunes National Lakeshore similarly omits hunting from an extensive list of acceptable recreational activities, H.Rep. No. 1782, 89th Cong., 2d Sess. 3 (1966), U.S.Code Cong. & Admin.News 1966, p. 4116, and the act itself commands that the lakeshore shall be "permanently preserved" in its present state. 16 U.S.C. § 460u–6(b) (1982). And again, the committee report on the Santa Monica Mountains National Recreation Area states that the park was created to preserve the natural resources of the area and to assure that they would not be lost "through adverse actions by special interest groups." H.Rep. No. 1165, 95th Cong.2d Sess. 58 (1978).

Finally, with respect to the extent trapping must be regarded as a discrete predatory activity, plaintiff submits that the use of the word "hunting" in the relevant legislation implicitly subsumes trapping as a subset. However, although the enabling acts for two parks do contain provisions allowing hunting, fishing *and trapping* despite titles reading simply "Hunting and Fishing," 16 U.S.C. §§ 459i–4, 460dd–4 (1982), when Congress has intended to provide for trapping, it has generally done so explicitly, and its omission in other statutes must be presumed to be intentional. Thus, hunting *and trapping* have been expressly authorized in 20 park areas, but in 25 others Congress authorized only hunting. On this record, the Court cannot but find that Congress considers the two activities to be distinct.[12]

---

**12.** The Court notes that comments received by the NPS following publication of its proposed regulations in the Federal Register in 1982 favored a *trapping* ban in parks whose enabling acts were silent on the subject by a 1584 to 137 margin. A.R. Doc. 45 at 2. In adopting the new regulations, the Park Service explained that trapping reduced the opportunities for the pub-

In sum, upon review of the relevant legislative histories and the statutes themselves, the Court is satisfied that the Park Service's reading of the statutory law comports with the apparent legislative intent; its interpretation is at least a reasonable one, and that is all it need be in the circumstances. The Secretary and the Park Service have been charged by Congress with the responsibility for achieving the sometimes conflicting goals of preserving the country's natural resources for future generations while ensuring their enjoyment by current users. Notwithstanding his recent predecessors may have permitted hunting and trapping in selected park areas of their choosing, the present Secretary has re-examined the subject in the light of recent amendments to the Organic Act and has concluded that his primary management function with respect to Park wildlife is its preservation unless Congress has declared otherwise. The regulation thus issues rationally from that conclusion, and if relief is to be forthcoming, plaintiff must look to Congress for it, not the courts.

Therefore, for the foregoing reasons, it is, this 24th day of February, 1986,

ORDERED, that plaintiff's motion for summary judgment is denied; and it is

FURTHER ORDERED, that defendants' motions for summary judgment are granted, and the complaint is dismissed with prejudice.

---

lic to view certain wildlife species, that it was predominantly a commercial activity which also threatened public safety, and that it could be allowed only in park areas whose enabling acts specifically provided for it. A.R. Doc. 46 at 2.