**MICHIGAN UNITED CONSERVATION CLUBS, a Michigan non-profit corporation, National Trappers Association, an Iowa non-profit corporation, James J. Woods, Charles L. Dobbins, James E. Campbell, and Richard L. Miller, Plaintiffs–Appellants,**

v.

**Manuel LUJAN, Secretary of the Interior of the United States; Grant Peterson, Park Superintendent of Pictured Rocks National Lakeshore, and Richard Peterson, Park Superintendent of Sleeping Bear Dunes National Lakeshore, Defendants–Appellees.**

No. 90–2013.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 19, 1991.

Decided Nov. 13, 1991.

Kenneth P. Frankland (argued), McGinty, Brown, Jakubiak, Frankland, Hitch & Henderson, East Lansing, Mich., M. Carol Bambery (argued), Michigan United Conservation Clubs, Lansing, Mich., for plaintiffs-appellants.

Andrew C. Mergen (argued and briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., John A. Smietanka, U.S. Atty., Daniel M. LaVille, Office of the U.S. Atty., Grand Rapids, Mich., for defendants-appellees.

James H. Warner (briefed), Nat. Rifle Ass'n of America, Washington, D.C., for amicus curiae Nat. Rifle Ass'n.

· Paul A. Lenzini (argued and briefed), Washington, D.C., for Intern. Ass'n of Fish and Wildlife Agencies.

Before GUY and BOGGS, Circuit Judges, and McRAE, Senior District Judge.*

RALPH B. GUY, Jr., Circuit Judge.

Plaintiffs, Michigan United Conservation Clubs and the National Trappers Association, filed this action asking the district court to declare unlawful and enjoin the enforcement of a regulation of the National Park Service (NPS or Park Service) as applied to two NPS administered areas, Pictured Rocks National Lakeshore (Pictured Rocks) and Sleeping Bear Dunes National Lakeshore (Sleeping Bear).[1] Promulgated under the aegis of the Secretary of Interior, the regulation prohibits trapping in the National Park System except where specifically authorized by Congress. 36 C.F.R. § 2.2(b). Although the enabling acts creating Sleeping Bear and Pictured Rocks require the Secretary to permit "hunting and fishing," the acts do not mention "trapping."

In district court, plaintiffs argued that, by authorizing hunting, Congress intended to permit trapping. Plaintiffs further argued that 36 C.F.R. § 2.2(b) is contrary to previous Park Service policy governing the lakeshores and not within the authority granted to the Secretary by Congress. On cross-motions for summary judgment, the district court held that the regulation was a reasonable interpretation of the enabling acts of Sleeping Bear and Pictured Rocks, not arbitrary or capricious, and within the

---

* Honorable Robert M. McRae, Jr., United States District Court for the Western District of Tennessee, sitting by designation.

1. On appeal, *amicus curiae* briefs were filed in support of plaintiffs by the International Association of Fish and Wildlife Agencies and the National Rifle Association.

agency's statutory authority. Accordingly, the district court denied plaintiffs' motion for summary judgment and granted summary judgment in favor of defendants.

For the reasons set forth below, we affirm the judgment of the district court.

## I.

In 1916, Congress established the National Park System for the management of a growing body of publicly-owned national parks and national monuments. Congress provided that this system would be managed pursuant to the following mission:

> [To] promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified ... by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1 (hereinafter, the "Organic Act"). The Secretary of the Interior was authorized to "make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks...." 16 U.S.C. § 3.

In the decades that followed the enactment of the Organic Act, Congress added to the park system, which now comprises 355 units, a number of "nontraditional" park areas such as national seashores, lakeshores, and scenic riverways. In establishing some of these areas, Congress specifically authorized hunting, trapping, and fishing as permitted recreational activities. In the 1960s, the Park Service responded to the growing heterogeneity of the park system by tailoring the administration of these lands according to three "management categories." According to the taxonomy outlined in a 1964 memorandum from then-Secretary of the Interior Udall to the Director of the Park Service, the park system was divided into three categories—natural, historical, and recreational—with the policies for their governance to be determined by the nature of the areas and their historical uses.

Park areas were categorized by grouping those areas with similar legislative directives. In the case of recreation areas, which included lands that had traditionally accommodated multiple uses, the Park Service began on its own initiative to allow hunting, trapping, and fishing if otherwise in accordance with the legislation affecting those areas. Admin.Rec.Doc. 9 at 31–33; 31 Fed.Reg. 12,750, 12,754 (1966).

Two subsequent amendments to the Organic Act, however, caused the Park Service to rethink its management policy. In a 1970 amendment, known as the General Authorities Act, 16 U.S.C. §§ 1a–1, et seq., Congress declared:

> [T]hat the national park system, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic, and recreation areas in every major region of the United States; ... that these areas, though distinct in character, are united through their inter-related purposes and resources into one national park system as cumulative expressions of a single national heritage; ... and that *it is the purpose of this Act to include all such areas in the System and to clarify the authorities applicable to the system....*

16 U.S.C. § 1a–1 (emphasis added). The Act continued: "Each area within the national park system shall be administered in accordance with the provisions of any statute made specifically applicable to that area[,]" as well as any other applicable authorities, "including but not limited to the [Organic Act]." 16 U.S.C. § 1c. Eight years later, in a rider to the Redwood National Park Expansion Act, Pub.L. No. 95–250, 92 Stat. 163, Congress reiterated its intention that:

> [T]he promotion and regulation of the various areas of the National Park System ... shall be consistent with and founded in the purpose established by [the Organic Act], to the common benefit

of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, *except as may have been or shall be directly and specifically provided by Congress.*

16 U.S.C. § 1a–1 (emphasis added). Pursuant to these amendments, the Park Service concluded that Congress conceived of the park system as an integrated whole, wherein hunting, trapping, and any other activities in derogation of park values could be allowed only if authorized by a park area's enabling legislation or other applicable federal law. *See* 1975 and 1978 NPS Management Policies, Admin.Rec.Doc. 17–19. Consequently, the Park Service initiated a revision of its regulations for the purpose of eliminating references to the three management categories and resolving inconsistencies that had developed in the management of park areas during the expansion of the National Park System. *See* Admin.Rec.Doc. 20.

The Secretary published proposed regulations in 1982, including the regulation in question in this lawsuit. 47 Fed.Reg. 11, 598. The contested regulation reads as follows:

§ 2.2  **Wildlife protection.**

(a) The following are prohibited:

(1) The taking of wildlife, except by authorized hunting and trapping activities conducted in accordance with paragraph (b) of this section.

. . . .

(b) *Hunting and trapping.*

(1) Hunting shall be allowed in park areas where such activity is specifically mandated by Federal statutory law.

(2) Hunting may be allowed in park areas where such activity is specifically authorized as a discretionary activity under Federal statutory law if the superintendent determines that such activity is consistent with public safety and enjoy-

ment, and sound resource management principles. Such hunting shall be allowed pursuant to special regulations.

(3) *Trapping shall be allowed in park areas where such activity is specifically mandated by Federal statutory law.*

(4) Where hunting or trapping or both are authorized, such activities shall be conducted in accordance with Federal law and the laws of the State within whose exterior boundaries a park area or a portion thereof is located. Nonconflicting State laws are adopted as a part of these regulations.

36 C.F.R. § 2.2 (emphasis added).

Following publication of its proposed regulations in the Federal Register in 1982, comments received by the NPS favored a *trapping* ban in parks whose enabling acts were silent on the subject by a 1584 to 137 margin. Admin.Rec.Doc. 45 at 2. In adopting the new regulations, the Park Service explained that trapping reduced the opportunities for the public to view certain wildlife species, that it was predominantly a commercial activity which also threatened public safety, and that it could be allowed only in park areas whose enabling acts specifically provided for it. After consideration of the comments received, final regulations were published on June 30, 1983, that were originally to take effect on October 3, 1983. 48 Fed.Reg. 30,252 (1983). Implementation of the hunting regulation was delayed, but finally took effect on April 30, 1984. The Secretary delayed the trapping regulation until January 15, 1985, at the request of trapping supporters to allow Congress to act on proposed legislation specifically authorizing trapping in certain areas, 49 Fed.Reg. 18,442, but the legislation was never passed. In September 1986, the NPS issued a final rule to remove the language from 36 C.F.R. § 2.2 that provided for the continuation of trapping, 51 Fed.Reg. 33,263, and plaintiffs thereafter filed the instant action.

II.

Our standard of review is determined by the nature of plaintiffs' challenge. In seeking to invalidate the Park Service regu-

lation regarding trapping, plaintiffs essentially challenge the Park Service's interpretation of its own organic statute, as well as the agency's interpretation of the enabling acts for Sleeping Bear and Pictured Rocks.

A regulation is invalid if in enacting it "the Secretary has exceeded his statutory authority" or "the regulation is arbitrary and capricious" and therefore fails to fulfill the intent of the statute.[2] *Herweg v. Ray*, 455 U.S. 265, 275, 102 S.Ct. 1059, 1066, 71 L.Ed.2d 137 (1982). However, "[t]he interpretation put on the statute by the agency charged with administering it is entitled to deference...." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); *Davis v. Secretary of HHS*, 867 F.2d 336, 338 (6th Cir.1989).

> [T]he court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnotes omitted). Thus, while we "must reject administrative constructions of the statute ... that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement[,]" *Federal Election Comm'n*, 454 U.S. at 32, 102 S.Ct. at 42, we should follow "the construction of a statute by those charged with its execution ... unless there are compelling indications that it is wrong[.]" *Red Lion Broadcast-*

ing Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969).

"The question for this court, therefore, is not whose interpretation of the statute we prefer, but whether the Secretary's interpretation is reasonable, consistent, and persuasive." *Whiteside v. Secretary of HHS*, 834 F.2d 1289, 1292 (6th Cir.1987).

In the instant case, we must ascertain the intent of Congress, as expressed in the Organic Act, the amendments, and the enabling acts of Sleeping Bear and Pictured Rocks. Specifically, we must determine whether the Park Service has made a "permissible construction" of these congressional acts to preclude trapping in the two national lakeshores in Michigan, or whether there are compelling indications that the agency construction is wrong.

The regulation at issue here, 36 C.F.R. § 2.2, has been challenged before, not as applied to a specific Park Service unit, but as applied to the entire National Park System. In that case, *National Rifle Association of America v. Potter*, 628 F.Supp. 903 (D.D.C.1986), the court conducted a thorough review of the Organic Act, including its 1970 and 1978 amendments. The plaintiff in that case contended that the language of these statutes was consistent with properly regulated hunting and trapping, while the relevant government agencies argued that these statutes directed them to conserve and safeguard wildlife from harm, whether from natural or human causes.

The court found that, although the language of the Organic Act was not inconsistent with the concept of limited trapping and hunting, Congress placed specific emphasis on conservation. *Id.* at 909. After noting that Congress saw fit to authorize hunting and/or trapping in the enabling

---

2. Our review is in accordance with the Administrative Procedure Act (APA), 5 U.S.C. § 706, which states in pertinent part:
    To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

....
    (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    ....
    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right....

acts of some Park Service units, yet chose not to address it in others, the court determined that the Park Service could rationally conclude that Congress intended not to allow these activities where not specifically authorized. *Id.* at 909, 912.

█ The court's holding in *Potter* was also predicated upon a review of the legislative histories of various enabling acts. *Id.* at 910–11. We choose not to replicate the review already conducted by that court. Suffice it to say, we agree with and adopt the findings in *Potter* supporting the view that, unlike national forests, Congress did not regard the National Park System to be compatible with consumptive uses. Rather, Congress intended the Park Service to manage the system in order "to conserve the scenery and the natural and historic objects and the wild life therein ... in such manner and by such means as will leave them unimpaired for the enjoyment of future generations[,]" 16 U.S.C. § 1, "except as may have been or shall be directly and specifically provided by Congress." 16 U.S.C. § 1a–1. Notwithstanding that the goals of user enjoyment and natural preservation may sometimes conflict, the NPS may rationally conclude, in light of the Organic Act and its amendments, that its primary management function with respect to wildlife is preservation unless Congress has declared otherwise.

█ We thus turn to the question whether Congress has ever specifically authorized trapping in the two national lakeshores at issue in the instant case. The only congressional expression relied upon by plaintiffs is the legislation creating Sleeping Bear and Pictured Rocks.

Pictured Rocks was established in 1966 pursuant to 16 U.S.C. § 460s, *et seq.* Section 460s sets forth the statement of purpose of this park:

In order to preserve for the benefit, inspiration, education, recreational use, and enjoyment of the public a significant portion of the diminishing shoreline of the United States and its related geographic and scientific features, the Secretary of the Interior (hereinafter referred to as the "Secretary") is authorized to take appropriate action, as herein provided, to establish in the State of Michigan the Pictured Rocks National Lakeshore.

Section 460s–4, entitled "Hunting and fishing," states:

In administering the lakeshore *the Secretary shall permit hunting and fishing* on lands and waters under his jurisdiction in accordance with the applicable laws of the United States and of Michigan. The Secretary, after consultation with the Michigan Department of Conservation, may designate zones and establish periods where and when no hunting shall be permitted for reasons of public safety, administration, or public use and enjoyment. The secretary shall, after consultation with such department, issue regulations, consistent with this section, as he may determine necessary to carry out the purposes of this section.

(Emphasis added). Sleeping Bear was established in 1970 pursuant to 16 U.S.C. § 460x, *et seq.* Section 460x sets forth the purpose of the Act:

(a) The Congress finds that certain outstanding natural features, including forests, beaches, dune formations, and ancient glacial phenomena, exist along the mainland shore of Lake Michigan and on certain nearby islands in Benzie and Leelanau Counties, Michigan, and that such features ought to be preserved in their natural setting and protected from developments and uses which would destroy the scenic beauty and natural character of the area. In order to accomplish this purpose for the benefit, inspiration, education, recreation, and enjoyment of the public, the Secretary ... is authorized to take appropriate action, as herein provided, to establish in the State of Michigan the Sleeping Bear Dunes National Lakeshore. In carrying out the provisions of sections 460x to 460x–14 of this title, the Secretary shall administer and protect the Sleeping Bear Dunes National Lakeshore in a manner which provides for recreational opportunities consistent with the maximum protection of the natural environment within the area.

Section 460x allows hunting and fishing in language almost identical to that of section 460s–4 above. Neither of these sections has been changed since their enactment.

■ In addition to the absence of any reference to trapping in the acts creating Sleeping Bear and Pictured Rocks, the parties agree that the legislative histories for those acts make no mention of trapping. Accordingly, plaintiffs' contention that Congress intended to allow trapping in these areas rests upon the assertion that Congress meant to allow trapping when it expressly provided for "hunting and fishing."

This same argument appeared in the challenge to 36 C.F.R. § 2.2 faced by the court in *Potter*. After a thorough review of the promulgation of the regulation at issue here, the district court responded to the assertion as follows:

> Finally, with respect to the extent trapping must be regarded as a discrete predatory activity, plaintiff submits that the use of the word "hunting" in the relevant legislation implicitly subsumes trapping as a subset. However, although the enabling acts for two parks do contain provisions allowing hunting, fishing *and trapping* despite titles reading simply "Hunting and Fishing," 16 U.S.C. §§ 459i–4, 460dd–4 (1982), when Con-

gress has intended to provide for trapping, it has generally done so explicitly, and its omission in other statutes must be presumed to be intentional. Thus, hunting *and trapping* have been expressly authorized in 20 park areas, but in 25 others Congress authorized only hunting. On this record, the Court cannot but find that Congress considers the two activities to be distinct.

*Id.*, 628 F.Supp. at 911 (footnote omitted).[3] As did the district court in the instant case, this court agrees and adopts the reasoning set forth in *Potter*.

Plaintiffs sought to undermine this conclusion by submitting to the district court affidavits, taken in 1990 while plaintiffs' suit was pending, of congressmen and state officials familiar with the Pictured Rocks and Sleeping Bear enabling acts. These affiants averred that Congress, at the time the lakeshores were created, intended that trapping would continue. For example, Raymond Clevenger, elected in 1964 as Michigan's representative to Congress for the 11th Congressional District, which included the Pictured Rocks area, averred that trapping "was never discussed because we all understood that trapping was a part of the generic concept of hunting, and the word 'hunting' was all inclusive."[4]

---

3. In support of this conclusion, defendants in this case point out that Apostle Islands National Lakeshore and Sleeping Bear were established within one month of each other in 1970. In establishing Apostle Islands, Congress expressly provided for "hunting, fishing, and trapping," 16 U.S.C. § 460w–4, yet provided only for "hunting and fishing" in the enabling act creating Sleeping Bear. Similarly, Indiana Dunes National Lakeshore and Pictured Rocks were created within one month of each other in 1966; the enabling act for Indiana Dunes does not mention hunting, *see* 16 U.S.C. § 460u, *et seq.*, whereas Pictured Rocks specifically allows for "hunting and fishing." *See, e.g.*, Jean Lafitte National Historic Park, 16 U.S.C. § 230d ("Within the Barataria Marsh Unit, the Secretary shall permit hunting, fishing (including commercial fishing), and trapping"); Cape Lookout National Seashore, 16 U.S.C. § 459g–3 ("[T]he Secretary shall permit hunting and fishing, including shellfishing"); Gateway National Recreation Area, 16 U.S.C. § 460cc–2(f) ("[T]he Secretary shall permit hunting, fishing, shellfishing, trapping, and the taking of specimens").

4. Congressman Clevenger's understanding of the legislation, as set forth in his affidavit, reads in pertinent part:

> 4. I introduced and was the principal sponsor of HR 8678 in the 89th Congress, which Bill, along with a companion Bill introduced by Senator Phil Hart, would later become Federal law when signed by President Johnson on October 6, 1966. (16 USC Section 460s–4).
>
> 5. As the main sponsor and as the Congressman representing the 11th Congressional District, I was acutely aware that hunting, fishing and trapping had long been practiced within the confines of the lakeshore pursuant to State law and that we had not differentiated between hunting and trapping as my constituents and I believed those concepts were one and the same.
>
> . . . .
>
> 8. My bill, which was in part drafted by and fully supported by the Department of the Interior, permitted hunting and fishing and, after reviewing my files, there is no question in my mind that trapping should be included

Plaintiffs contend that the post-enactment affidavits support the view that Congress, when establishing the two national lakeshores, thought it unnecessary to embellish upon the word "hunting" by including "trapping," because trapping was always considered a form of hunting. Plaintiffs argue that the district court erred when it found "these post-enactment statements ... carry little weight," as the absence of any contemporaneous legislative history discussing trapping in the lakeshores creates the need to rely on the post-enactment affidavits submitted by the legislation's sponsors.[5] The unpublished decision cited favorably by plaintiffs, *Missouri Trappers Ass'n v. Hodel*, No. S86–0193C(D) (E.D.Mo.1987), relied extensively on the post-enactment statements of a sponsor of the Ozark National Scenic Riverways statute to find 36 C.F.R. § 2.2 not applicable to that park unit. We find the reasoning of this decision lacking in persuasiveness in light of the many decisions that have stressed that the post-enactment statement of a member of Congress is not part of the legislative history of a statute.

In *Tinch v. Walters*, 765 F.2d 599 (6th Cir.1985), this court stated that "[t]he views of members of Congress as to the construction of a statute adopted by a previous Congress have very little if any significance." *Id.* at 602 (citations omitted). *See also Buck v. HHS*, 923 F.2d 1200, 1207 (6th Cir.1991), and *Weinberger v. Rossi*, 456 U.S. 25, 35–36, 102 S.Ct. 1510, 1517–18, 71 L.Ed.2d 715 (1982). "[P]ost-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage. Such statements 'represent only the personal views of these legislators, since the statements were [made] after passage of the Act.' " *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974) (citations omitted) (quoting *National Woodwork Mfg. Ass'n v. NLRB*, 386 U.S. 612, 639 n. 34 1967, 87 S.Ct. 1250, 1265 n. 34, 18 L.Ed.2d 357)). Most recently Justice Scalia observed:

> In my opinion, the views of a legislator concerning a statute already enacted are entitled to no more weight than the views of a judge concerning a statute not yet passed....
>
> Arguments based on subsequent legislative history, like arguments based on antecedent futurity, should not be taken seriously, not even in a footnote.

*Sullivan v. Finkelstein*, —— U.S. ——, 110 S.Ct. 2658, 2667, 110 L.Ed.2d 563 (1990) (Scalia, J., concurring in part).

While the foregoing cases refer generally to subsequent legislative history and do not specifically address the subsequent statements of *sponsors* of bills or amendments, we decline to give significance to sponsors' private thoughts expressed subsequent to the enactment of a bill or an amendment. *See Continental Can Co. v. Chicago Truck Drivers*, 916 F.2d 1154, 1157 (7th Cir.1990) ("Authors' private meanings—meanings subjectively held but not communicated—do not influence.... That is why statements after enactment do not count; the legislative history of a bill is valuable only to the extent it shows genesis and evolution, making 'subsequent legislative history' an oxymo-

---

as a part of hunting. It was never discussed because we all understood that trapping was a part of the generic concept of hunting, and the word "hunting" was all inclusive.

9. Based upon my personal recollection and review of my files, trapping had been such a long-standing practice in the Pictured Rocks area and was appropriately regulated by the State of Michigan, there was never any discussion by the National Park Service or anybody else that "trapping" was to be differentiated from "hunting". To the contrary, it was certainly my intent and I believe the intent of the Congress to maintain the cus-

toms and practices of hunting and fishing, which for all of us in the Upper Peninsula included trapping.

5. Although plaintiffs refer to the need to include the views of sponsors of the legislation, only one of the five affiants involved in the original legislation, Raymond Clevenger, was a sponsor of either of the enabling acts. The remaining 1990 affidavits were submitted by former state representatives Thomas J. Anderson and Warren Goemaere; Thomas L. Kimball, past executive director of the National Wildlife Federation; and O. Stewart Myers, past president of the Michigan United Conservation Clubs.

ron."); *United Mine Workers v. Federal Mine Safety & Health Review Comm'n,* 671 F.2d 615, 622–23 (D.C.Cir.), *cert. denied,* 459 U.S. 927, 103 S.Ct. 239, 74 L.Ed.2d 189 (1982). *See also American Constitutional Party v. Munro,* 650 F.2d 184, 188 (9th Cir.1981) ("As a member of the Conference Committee which drafted the legislation, Representative Nelson's statement might be entitled to some weight if it had been made contemporaneously with the passage of the legislation. Coming one year later, it is entitled to no weight and cannot be relied on as indicative of legislative motivation or intent.").

In sum, we agree with the following observation made by the Fifth Circuit:

> The retroactive wisdom provided by the subsequent speech of a member of Congress stating that yesterday we meant something that we did not say is an ephemeral guide to history.... What happened after a statute was enacted may be history and it may come from members of the Congress, but it is not part of the legislative history of the original enactment.

*Rogers v. Frito–Lay, Inc.,* 611 F.2d 1074, 1080 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). Accordingly, we find that the district court did not err when it refused to give considerable weight to the post-enactment affidavits.

Furthermore, in determining whether the NPS regulation was inconsistent with the statutory mandate of the Park Service or contrary to the policy intended by Congress, the district court assessed the post-enactment affidavits in light of post-enactment developments on the part of NPS and Congress. Thus, even assuming that the district court should have given *some* consideration to the affidavits, it appears that it did, but only to the extent that it also considered Congress' apparent acquiescence in the NPS trapping regulation.

■ Plaintiffs claim that the latter consideration amounts to reversible error. However, while post-enactment developments cannot be accorded the weight of contemporary legislative history, and Con-

gress' failure to disapprove a regulation is not dispositive of congressional intent, the district court would be remiss if it ignored evidence that implies congressional intent. *Grove City College v. Bell,* 465 U.S. 555, 568, 104 S.Ct. 1211, 1219, 79 L.Ed.2d 516 (1984); *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982). Where "an agency's statutory construction has been 'fully brought to the attention of the public and Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *United States v. Rutherford,* 442 U.S. 544, 554, n. 10, 99 S.Ct. 2470, 2476, n. 10, 61 L.Ed.2d 68 (1979) (quoting *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 487–89, 60 S.Ct. 982, 988–89, 84 L.Ed. 1311 (1940)).

As explained above, while the hunting regulation took effect on April 30, 1984, the trapping regulation was delayed to permit trapping in Sleeping Bear, Pictured Rocks, and nine other areas until January 15, 1984, in order to allow Congress to act on proposed legislation authorizing trapping in certain areas. 49 Fed.Reg. 18,442, Admin.Rec. 94. Legislation was introduced to allow trapping in four of the eleven areas, not including Sleeping Bear and Pictured Rocks. On January 14, 1985, the Park Service amended 36 C.F.R. § 2.2 to delay the ban on trapping until January 15, 1987. 50 Fed.Reg. 18,150. None of the legislation was enacted, and, on September 19, 1986, the Park Service issued a final rule removing the language that had provided for continued trapping. While inaction by Congress is not often a useful guide, the inaction here was significant, and the district court did not err by giving it consideration. *See Bob Jones Univ. v. United States,* 461 U.S. 574, 600, 103 S.Ct. 2017, 2033, 76 L.Ed.2d 157 (1983).

Upon review of the relevant legislation, including the enabling acts of Sleeping Bear and Pictured Rocks, we are satisfied that the Park Service's reading of the statutory law comports with the apparent legislative intent. Although an interpretation

of the pertinent legislation may exist to support plaintiffs' construction of congressional intent, the Park Service's interpretation is a reasonable one, and that is all that is necessary to uphold the regulation.

Accordingly, the district court order granting defendants' motion for summary judgment and denying plaintiffs' motion for summary judgment is AFFIRMED.