# Section 609 of the FY 1996 Omnibus Appropriations Act

A provision of an appropriations law purporting to condition the use of funds to pay for the United States' diplomatic representation to Vietnam on the President's making a particular detailed certification "within 60 days" does not require the cutoff of the covered funds until such time as the President has made the certification, but instead permits use of the funds to maintain diplomatic representation in Vietnam for 60 days after enactment.

Taken as a whole, the provision impermissibly impairs the exercise of the core Presidential power to recognize, and maintain diplomatic relations with, a foreign government. Hence, the provision is unconstitutional and without legal force or effect.

May 15, 1996

MEMORANDUM OPINION FOR THE LEGAL ADVISER
DEPARTMENT OF STATE

You have sought our advice on section 609 of the Fiscal Year 1996 Omnibus Appropriations Act (H.R. 3019), Pub. L. No. 104–134, 104 Stat. 1321, 1321–63 ("the Act"), which the President signed into law on April 26, 1996.[1] That section purports to condition the use of appropriated funds to pay for the United States' diplomatic representation to Vietnam on the President's making a detailed certification "within 60 days." You have asked whether section 609 prohibits the use of appropriated funds for this purpose from the moment the Act was signed into law, unless the President, within 60 days thereafter, provides the requisite certification, and so enables diplomatic relations between the two countries to resume.[2]

At the very least, section 609 does not require a cutoff of funds until the President makes the certification. Rather, the use of appropriated funds for maintaining diplomatic representation to Vietnam remains lawful and proper during the sixty days after enactment, so that the President, during that period, may gather and assess the facts needed to enable him to decide whether or not to provide the certification, without disrupting the United States' existing diplomatic relations with Vietnam in the interval. This construction follows the natural meaning of the language of the section, comports with the rational and efficient use of government resources, and reduces the likelihood of unnecessary diplomatic friction.

More importantly, we believe that section 609, taken as a whole, impermissibly impairs the exercise of a core Presidential power — the authority to recognize,

---

[1] The section originated as section 609 of the Commerce, Justice, State and the Judiciary Appropriations Bill for Fiscal Year 1996 (H.R. 2076).

[2] Several members of Congress have written to the Secretary of State to advocate this view of the provision's meaning. See Letter for the Honorable Warren Christopher, Secretary of State, from Senator Bob Smith, et al. (Apr. 26, 1996) ("Congressional Letter"). In support of their interpretation, the writers attach a two paragraph opinion from an Associate General Counsel of the General Accounting Office. See Letter for the Honorable Robert C. Smith, United States Senate, from Gary I. Kepplinger, Associate General Counsel, General Accounting Office (Apr. 26, 1996) ("GAO Opinion").

and to maintain diplomatic relations with, a foreign government.[3] Accordingly, section 609 is unconstitutional and without legal force or effect.

Section 609, in its entirety, reads as follows:

> None of the funds appropriated or otherwise made available by this Act may be obligated or expended to pay for any cost incurred for (1) opening or operating any United States diplomatic or consular post in the Socialist Republic of Vietnam that was not operating on July 11, 1995; (2) expanding any United States diplomatic or consular post in the Socialist Republic of Vietnam that was operating on July 11, 1995; or (3) increasing the total number of personnel assigned to United States diplomatic or consular posts in the Socialist Republic of Vietnam above the levels existing on July 11, 1995, unless the President certifies within 60 days, based upon all information available to the United States Government that the Government of the Socialist Republic of Vietnam is cooperating in full faith with the United States in the following four areas:
>
> > (1) Resolving discrepancy cases, live sightings and field activities,
> >
> > (2) Recovering and repatriating American remains,
> >
> > (3) Accelerating efforts to provide documents that will help lead to fullest possible accounting of POW/MIA's,
> >
> > (4) Providing further assistance in implementing trilateral investigations with Laos.

The statutory reference to "July 11, 1995" keys the provisions of the bill to the date of the President's offer to establish diplomatic relations with Vietnam. *See Remarks by the President Announcing the Normalization of Diplomatic Relations with Vietnam*, 2 Pub. Papers of William J. Clinton 1073 (July 11, 1995). In announcing that offer, the President stated that from the beginning of his Administration, "any improvement in relationships between America and Vietnam has depended upon making progress on the issue of Americans who were missing in action or held as prisoners of war." *Id.* Noting that he had lifted the trade embargo against Vietnam seventeen months earlier "in response to their cooperation and to enhance our efforts to secure the remains of lost Americans and to

---

[3] There is yet another apparent constitutional flaw in section 609: it purports to prescribe to the President the manner in which he must proceed to recover the remains of Americans, and to account for POWs and MIAs, in Vietnam. Such detailed prescriptions may well encroach on the President's constitutional authority as Commander in Chief. We do not press that objection here.

determine the fate of those whose remains have not been found," *id.*, the President stated that the Government of Vietnam had, in the interval, "taken important steps to help us resolve many cases," including releasing the remains of Americans, delivering documents that shed light on the fate of MIAs, assisting efforts to reduce discrepancy cases, and stepping up cooperation with Laos, where many Americans were lost. *Id.* The President stated that "[n]ever before in the history of warfare has such an extensive effort been made to resolve the fate of soldiers who did not return," but he added that "normalization of our relations with Vietnam is not the end of our effort." *Id.* On July 12, 1995, the Government of Vietnam agreed to diplomatic relations with the United States. Soon thereafter, the United States Liaison Office in Vietnam was upgraded to a Diplomatic Post.

The four certification requirements in section 609 relate, respectively, to resolving discrepancy cases, recovering American remains, accelerating the provision of documents relating to POWs and MIAs, and promoting trilateral investigations with Laos. All four conditions derive directly from a July 2, 1993 Presidential statement that set forth the areas in which the United States expected to see progress before expanding diplomatic relations with the Government of Vietnam. *See Statement by the President on United States Policy Toward Vietnam,* 1 Pub. Papers of William J. Clinton 990 (July 2, 1993). [4] The State Department advises us that later statements and testimony have referred, in varying language, to the same four areas, and that, since July, 1993, progress in United States-Vietnamese relations has been measured in terms of the satisfaction of the four criteria.

## I.

Section 609 provides that "[n]one of the funds appropriated or otherwise made available by this Act may be obligated or expended to pay for any cost incurred" for the stated purposes, "unless the President certifies within 60 days, based upon all information available to the United States Government that the Government of the Socialist Republic of Vietnam is cooperating in full faith with the United States" in four areas relating to POWs and MIAs. The Congressional Letter, sent just after the bill was passed and signed, argues that the provision forbids any expenditure of funds before the President makes a certification. The letter relies on and attaches a six-sentence opinion of the Associate General Counsel of the General Accounting Office. According to that opinion, the "plain language" of the section leads to the conclusion that "no obligations or expenditures may be

---

[4] In that statement, the President announced that Vietnam would have access to the International Monetary Fund, and that he would be sending a high-level delegation to Vietnam. He explained that "any further steps in relations between our two nations depend on tangible progress on the outstanding POW/MIA cases," and said that the delegation would make clear that "[w]e insist upon efforts by the Vietnamese in four key areas," including (1) remains, (2) discrepancy cases, (3) investigations with Laos and (4) archival material. *Id.* at 991. These four conditions are substantially the same as those that section 609 treats as mandates that the President must certify Vietnam has met.

made prior to the President's certification." The Congressional Letter also refers to, but does not supply, an opinion of the Senate Legislative Counsel.

We conclude that, under the better reading, section 609 would not cut off funds until 60 days have elapsed. Section 609 purports to forbid obligations or expenditures "unless the President certifies within 60 days" that certain facts exist; the provision does not say that funds may not be obligated or expended "until" the President certifies or unless the President "has certified." The most natural reading of the language actually used is that funds are to be cut off if sixty days pass without the Presidential certification.

Our reading is supported by section 609's requirement that the President make his decision "based upon all information available to the United States Government." The statute thus contemplates a wide-ranging inquiry, covering every agency of the Government that might have relevant information. To require a termination of funds before the 60-day period elapsed would push the President toward making a hasty and ill-considered decision. Such a decision would conflict with the full inquiry that section 609 requires.

Furthermore, the Supreme Court has cautioned that Congress must express its intent clearly before a statute is read "so as to give rise to a serious question of separation of powers which in turn would . . . implicate[ ] sensitive issues of the authority of the Executive over relations with foreign nations." *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500 (1979) (describing *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10 (1963)). *See also Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 465–67 (1989); *Armstrong v. Bush,* 924 F.2d 282, 289 (D.C. Cir. 1991). Section 609, if read to order an immediate cut off of funds, would impede the President's conduct of foreign affairs. On that reading, section 609 could require largely ending operations at the Embassy pending the certification and then starting up operations again after a certification was made. Such a procedure not only would entail severe administrative difficulty, but also could cause diplomatic embarrassment. Such lurches from full to lesser diplomatic relations and back again would call into question the reliability and stability of the United States' conduct of foreign affairs. As we discuss below, we believe that section 609 encroaches on the President's constitutional powers and is therefore invalid. At the least, however, the "within 60 days" language of section 609 should be construed in a manner that avoids seriously impairing the President in the exercise of his constitutional responsibilities.

In offering a different interpretation, the GAO Opinion relies on the "plain language" of the section. However, the "plain language" does not support the GAO Opinion. Furthermore, even if (contrary to our view) section 609 in at least some circumstances might cut off funds immediately, the GAO Opinion's "plain language" is not the *literal* language of section 609. The *literal* language of section 609 would be that expenditures made even before the Presidential certification

would be lawful, as long as the President made the certification at any time during the 60-day period. The GAO Opinion simply asserts that the "plain language" makes a Presidential certification "a precondition to the availability of the funds," without explaining why this result follows.

When section 609 was being considered by Congress, it would have been a simple matter to draft the language to achieve the result that the authors of the Congressional Letter now desire. Such language could have stated — but did not state — that no funds appropriated or otherwise made available by the Act could be obligated or expended "unless the President has previously certified" that the requisite conditions had been met. Instead of seeking to amend the provision, the authors waited until the legislation was enacted and then sought to place a particular interpretation on the language. As post-enactment legislative history, the Congressional Letter sheds no light on the meaning of the language. *See, e.g., Sullivan v. Finkelstein,* 496 U.S. 617, 631–32 (1990) (Scalia, J., concurring in part); *Tataranowicz v. Sullivan,* 959 F.2d 268, 278 n.6 (D.C. Cir. 1992), *cert. denied,* 506 U.S. 1048 (1993); *Michigan United Conservation Clubs v. Lujan,* 949 F.2d 202, 208–10 (6th Cir. 1991); *Multnomah Legal Servs. Workers Union v. Legal Services Corp.,* 936 F.2d 1547, 1555 (9th Cir. 1991).[5]

## II.

More fundamentally, section 609's prohibition on the use of appropriated funds to maintain diplomatic relations with Vietnam unless the President provides Congress with a detailed certification is an unconstitutional condition on the exercise of the President's power to control the recognition and non-recognition of foreign governments — a power that flows directly from his textually-committed authority to receive ambassadors, U.S. Const. art. II, § 3.[6] It is by now firmly established that "[p]olitical recognition is exclusively a function of the Executive." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 410 (1964).[7] As President Woodrow Wilson (himself a leading constitutional scholar) stated in a message to Congress in 1919, "the initiative in directing the relations of our Government with foreign governments is assigned by the Constitution to the Executive, and to the

---

[5] If the "plain language" of section 609 required an immediate termination of funds, it is hard to see why the authors of the Congressional Letter thought it necessary to seek an opinion on the point from the GAO. The insistence that the "plain language" supports their view rings hollow.

[6] Relatedly, of course, the President has the power to appoint Ambassadors, and to make treaties, by and with the advice and consent of the Senate. U.S. Const. art. II, § 2, cl. 2.

[7] *See also United States v. Belmont,* 301 U.S. 324, 330 (1937); *Goldwater v. Carter,* 444 U.S. 996, 1007 (1979) (Brennan, J., dissenting); *Can v. United States,* 14 F.3d 160, 163 (2d Cir. 1994); *Phelps v. Reagan,* 812 F.2d 1293, 1294 (10th Cir. 1987); *Americans United for Separation of Church and State v. Reagan,* 786 F.2d 194, 202 (3d Cir.), *cert. denied,* 479 U.S. 914 (1986); *Republic of Vietnam v. Pfizer, Inc.,* 556 F.2d 892, 894 (8th Cir. 1977); *Restatement (Third) of the Foreign Relations Law of the United States* § 204 (1987); 1 Green Hackworth, *Digest of International Law* 161–62 (1940).

Executive, only." [8] Accordingly, Congress may not determine the conditions that a foreign government must satisfy in order to be recognized by, or to enter into normal diplomatic relations with, the United States.

The Executive's recognition power[9] necessarily subsumes within itself the power to withhold or deny recognition, to determine the conditions on which recognition will be accorded, and to define the nature and extent of diplomatic contacts with an as-yet unrecognized government.[10] The United States' diplomatic history has illustrated, on many occasions, the importance of the Executive's powers to withhold or condition recognition.[11] Just as Congress may not usurp the Executive's power by attempting to compel the President affirmatively to recognize a particular government as the sole sovereign of a disputed area,[12] so also it may not ordain that the Executive is to withhold recognition, or that the Executive is not to accord recognition unless the foreign government concerned complies with requirements that Congress, rather than the Executive, imposes. Were Con-

---

[8] President Woodrow Wilson to Senator Albert B. Fall, Dec. 8, 1919, *reprinted in* S. Doc. No. 66-285, at 843D (1920). Similarly, when the Senate Foreign Relations Committee informed the executive branch during President Grover Cleveland's second Administration that it proposed to report out a resolution that purported to recognize the independence of a Republic of Cuba, the Secretary of State, Richard Olney, responded that that resolution, if adopted, could only be regarded as "an expression of opinion," because "[t]he power to recognize the so-called Republic of Cuba as an independent state rests exclusively with the Executive." *See* Eugene V. Rostow, *Great Cases Make Bad Law: The War Powers Act*, 50 Tex. L. Rev. 833, 866 (1972) (quoting Olney statement).

[9] "Recognition" has been defined as "the act of the Executive taking note of the facts [*e.g.*, that a particular government holds power in a certain territory] and indicating a willingness to allow all the legal consequences of that noting to operate. These are consequences in international law. Whether consequences also follow in municipal law is a matter for municipal law itself to determine." 1 Daniel Patrick O'Connell, *International Law* 128 (1970) (footnote omitted). The Executive may engage in diplomatic or other dealings with a government that it does not recognize, for example by entering into treaties or other agreements with that government.

[10] The President's recognition power "includes the power to determine the policy which is to govern the question of recognition." *United States v. Pink*, 315 U.S. 203, 229 (1942). The courts have given effect both to the Executive's refusal to recognize particular governments, and to the policies underlying such non-recognition. *See, e.g., Latvian State Cargo & Passenger S.S. Line v. McGrath*, 188 F.2d 1000, 1003 (D.C. Cir.), *cert. denied*, 342 U.S. 816 (1951); *The Maret*, 145 F.2d 431, 442 (3d Cir. 1944); *Russian Republic v. Cibrario*, 235 N.Y. 255, 263-65 (1923).

[11] Such occasions include President Wilson's refusal to recognize the Huerta government of Mexico in 1913 (which contributed to its downfall a year later); the refusal of Wilson's successors until President Franklin Roosevelt to recognize the Union of Soviet Socialist Republics; the Hoover Administration's non-recognition of the Japanese puppet state of Manchukuo in 1932; and the non-recognition of the People's Republic of China from the Truman Administration until President Nixon's de facto recognition of that government in 1972. *See* Congressional Research Service, *The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 99-16, at 567 (1987). Although originally it was the policy of the United States to "accept any foreign government existing *de facto*, respecting every fact as supreme over all theory," *Construction of the Mesilla Treaty*, 7 Op. Att'y Gen. 582, 587 (1855), recognition has come to depend on a variety of foreign policy concerns. Thus, the United States has at times withheld recognition unless the foreign government concerned has agreed to comply with particular conditions. *See, e.g., Establishment of Diplomatic Relations With Albania*, 13 Dep't St. Bull. 767 (1945); *American Mission to Albania Withdrawn*, 15 Dep't St. Bull. 913 (1946); *American Support of Free Elections in Eastern Europe*, 17 Dep't St. Bull. 407, 409 (1947) (non-recognition of Albania for failure to satisfy conditions required by Executive). In this Administration, the President has stated that he had used the possibility of United States recognition of the Government of Angola as "leverage towards promoting an end to the civil war and hostilities" in that country. *Remarks and an Exchange With Reporters Prior to Discussions With Archbishop Desmond Tutu*, 1 Pub. Papers of William J. Clinton 704, 704 (May 19, 1993). *See also* Louis L. Jaffe, *Judicial Aspects of Foreign Relations* 107-10 (1933) (through non-recognition, United States at various times pursued policy goal of discouraging violent revolutions against existing governments); *U.S. Policy on Nonrecognition of Communist China*, 39 Dep't St. Bull. 385 (1958) (bases of United States policy on nonrecognition of Communist China).

[12] *See Bill to Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C. 123 (1995).

gress to seek to direct and control the exercise of the recognition power in any of these ways, it would violate separation of powers principles.

The Supreme Court has identified two fashions in which Congress may impermissibly encroach on the Executive power. First, Congress may attempt to exercise itself one of the functions that the Constitution commits solely to the Executive, thus "pos[ing] a 'danger of congressional usurpation of Executive Branch functions.'" *Morrison v. Olson*, 487 U.S. 654, 694 (1988) (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 (1986)). Second, Congress may not attempt to "'impermissibly undermine' the powers of the Executive Branch, [*Commodity Futures Trading Comm'n v.*] *Schor*, [478 U.S. 833 (1986)] at 856, or 'disrupt[ ] the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions,' *Nixon v. Administrator of General Services*, [433 U.S. 425 (1977)] at 433." *Morrison*, 487 U.S. at 695.

Section 609 both poses a "danger of congressional usurpation" of the Executive function of recognition, and "impermissibly undermine[s]" that authority. In effect, section 609 requires the President either (1) to reduce our diplomatic presence in, and contacts with, Vietnam to the levels that existed immediately before his July 11, 1995 offer to normalize relations, or else (2) to go forward with normalizing relations, but only if Vietnam satisfies specific conditions that Congress, rather than the Executive, demands. This Congress may not do: if the United States is to impose conditions precedent on Vietnam for being recognized, it is for the President, not Congress, to decide what those conditions are. [13]

Specifically, section 609 purports to impose a certification requirement on the availability of funds (1) to "open[ ] or operat[e]" a diplomatic or consular post in Vietnam that was not operating on the date the President offered to establish diplomatic relations with that country, (2) to "expand[ ]" any such post that was operating in Vietnam before that date, or (3) to augment the number of personnel assigned to United States diplomatic or consular posts in Vietnam before that date. In our view, each of these three restrictions is unconstitutional. That the first two restrictions (on opening, operating or expanding any diplomatic or consular post in Vietnam) overtly infringe on the President's recognition power is, we think, clear. [14] While the unconstitutionality of the third restriction (on the number of

---

[13] The fact that the conditions Congress imposed in section 609 are similar to those that the President himself set forth in July, 1993 does not alter the analysis. The President retained the discretion to revise his criteria, apply them flexibly, or take account of other unrelated factors, in making an overall judgment as to the wisdom of normalizing our relations with Vietnam. As codified in section 609, however, the criteria have been transformed into hard-and-fast requirements that the President must certify Vietnam to have met before our diplomatic relations with its government can be normalized. Section 609 precludes the President from making the finely-shaded, situation-sensitive judgments that are necessary for conducting a successful recognition policy.

[14] An 1855 opinion by Attorney General Caleb Cushing, though rendered on grounds of the Appointments Clause rather than on the basis of the recognition power, supports our conclusion that Congress may not attempt to dictate to the President the level of our diplomatic representation to Vietnam. Attorney General Cushing addressed himself to legislation that stated that, from and after a date certain, the President "shall," by and with the Senate's advice and consent, "appoint representatives of the grade of envoys extraordinary and ministers plenipotentiary" to des-

Continued

195

personnel assigned to such posts) may be less patent, we think that, in the particular context surrounding the enactment of section 609, it too impermissibly invades a core Presidential power. As we have explained, section 609 was enacted against the backdrop of the progress that the Government of Vietnam had made between July, 1993 and July, 1995 in resolving POW/MIA issues, the President's July 11, 1995 offer to the Government of Vietnam, that government's response to it, and the ensuing diplomatic dealings between the two nations. Indeed, one of the signatories of the Congressional Letter explicitly stated that the purpose of a prior version of section 609 was to "bar[] the use of Federal funds for implementing the President's ill-considered, pre-mature [sic] decision to expand diplomatic relations with Vietnam." 141 Cong. Rec. H7765 (daily ed. July 26, 1995) (remarks of Rep. Gilman). [15] Thus, the unmistakeable intent and effect of section 609's restrictions, taken as a whole, are to return the United States' diplomatic relations with Vietnam to the very limited level that existed before the President's offer, or else to require that Vietnam demonstrably satisfy requirements imposed by legislative mandate. Thus, even if Congress may, for reasons of economy or efficiency, reduce the size of embassy staff, it may not do so as part of an effort, as here, to direct and control the recognition power in a particular instance.

## III.

The fact that in section 609 Congress is seeking to control the exercise of the Presidential recognition power indirectly, through the appropriations process, rather than as a direct mandate, does not change our conclusion. Broad as Congress's spending power undoubtedly is, it is clear that Congress may not deploy it to accomplish unconstitutional ends. [16] In particular, as our Office has insisted over

---

ignated countries. *Ambassadors and other Public Ministers of the United States*, 7 Op. Att'y Gen. 186, 214 (1855). The Attorney General opined that in this context, "'shall' must be construed to signify 'may;' for Congress cannot by law constitutionally require the President to make removals or appointments of public ministers on a given day, or to make such appointments of a prescribed rank, or to make or not make them at this or that place. . . . [W]e are therefore not to read this act as requiring the President to appoint and maintain a minister of the rank of envoy extraordinary at the courts of London, Paris, St. Petersburg, Madrid, Mexico, Copenhagen, regardless of what may, in his judgment and that of the Senate, be the necessities or interests of the public service; nor to read it as forbidding him to leave either of those legations, or any other, in the hands of a mere chargé d'affaires." *Id.* at 217–18. In the Attorney General's view, the President had "the absolute discretion at all times . . . to appoint a public minister of such degree as he and [the Senate] might please for any particular mission, or not to appoint any." *Id.* at 219.

[15] *See also Some in Congress oppose recognition of Vietnam*, The Baltimore Sun, July 11, 1995, at 1A, *available in* 1995 WL 2452091 (reporting statements by members of Congress threatening to bar use of Federal funds for diplomatic relations with Vietnam).

[16] *See United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872) (appropriations act unconstitutionally intruded on President's pardon power); *United States v. Lovett*, 328 U.S. 303, 316 (1946) (appropriations power misused to impose bill of attainder); *cf. Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 271 (1991) (Congress may not use its power over Federal property to achieve ends by indirect means that it is forbidden to achieve directly); *Frost & Frost Trucking Co. v. Railroad Comm'n*, 271 U.S. 583, 594 (1926) (State legislature cannot attach unconstitutional condition to privilege that it may deny). *See also Authority of Congressional Committees to Disapprove Action of Executive Branch*, 41 Op. Att'y Gen. 230, 233 (1955) (Att'y Gen. Brownell) ("If the practice of attaching invalid conditions to legislative enactments were permissible, it is

the course of several Administrations, "Congress may not use its power over appropriation of public funds 'to attach conditions to Executive Branch appropriations requiring the President to relinquish his constitutional discretion in foreign affairs.'" *Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports*, 16 Op. O.L.C. 18, 28 (1992) (quoting *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37, 42 n.3 (1990) (quoting *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions*, 13 Op. O.L.C. 258, 261 (1989))). [17]

Indeed, it has long been established that the spending power may not be deployed to invade core Presidential prerogatives in the conduct of diplomacy. [18] As early as 1818, an attempt by Representative Henry Clay to use appropriations bill rider to compel the recognition of a South American government was criticized by other members of Congress as a violation of separation of powers principles, and it soon proved to be abortive. [19] Then-Secretary of State (and later President) John Quincy Adams also urged constitutional objections to Clay's proposal before President Monroe's Cabinet:

> Instead of admitting the Senate or House of Representatives to any share in the act of recognition, I would expressly avoid that form of doing it which would require the concurrence of those bodies. It was, I had no doubt, by our Constitution an act of the Executive authority. General Washington had exercised it in recognizing

---

evident that the constitutional system of the separability of the branches of Government would be placed in the gravest jeopardy."); *Constitutionality of Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. 56, 61 (1933) (Att'y Gen. Mitchell) ("This proviso can not be sustained on the theory that it is a proper condition attached to an appropriation. Congress holds the purse strings, and it may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted and impose conditions in respect to its use, provided always that the conditions do not require operation of the Government in a way forbidden by the Constitution."); *Memorial of Captain Meigs*, 9 Op. Att'y Gen. 462, 469–70 (1860) (Att'y Gen. Black) (concluding that appropriations bill that contained condition that money be spent only under supervision of congressionally-designated individual was invalid); William P. Barr, contribution to symposium on *The Appropriations Power and the Necessary and Proper Clause*, 68 Wash. U. L.Q. 623, 628 (1990) ("Congress cannot use the appropriations power to control a Presidential power that is beyond its direct control"); Harold H. Koh, *Why the President (Almost) Always Wins in Foreign Affairs: Lessons of the Iran-Contra Affair*, 97 Yale L.J. 1255, 1303 n.218 (1988) (citing support for view that Congress acts unconstitutionally if it refuses to appropriate funds for President to carry out his enumerated constitutional responsibilities); Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1351 (1988).

[17] *See also The President's Compliance with the "Timely Notification" Requirement of Section 501(b) of the National Security Act*, 10 Op. O.L.C. 159, 169–70 (1986) ("[W]hile Congress unquestionably possesses the power to make decisions as to the appropriation of public funds, it may not attach conditions to Executive Branch appropriations that require the President to relinquish any of his constitutional discretion in foreign affairs.").

[18] This limitation on legislative power has been acknowledged by members of Congress *See* Orrin Hatch, contribution to symposium, *What the Constitution Means by Executive Power*, 43 U. Miami L. Rev. 197, 200–01 (1988) ("constitutional foreign policy functions may not be eliminated by a congressional refusal to appropriate funds. The Congress may not, for example, deny the President funding to receive ambassadors, negotiate treaties, or deliver foreign policy addresses . . . . Congress oversteps its role when it undertakes to dictate the specific terms of international relations."); Eli E. Nobleman, *Financial Aspects of Congressional Participation in Foreign Relations*, 289 Annals Am. Acad. Pol. & Soc. Sci. 145, 150 (1953) (citing remarks of Representative Daniel Webster, objecting on constitutional grounds in 1826 to appropriations rider that purported to attach instructions to United States diplomats).

[19] *See* Edward S. Corwin, *The President: Office and Powers 1787–1984*, at 216 (5th rev. ed. 1984).

the French Republic by the reception of Mr. Genest. Mr. Madison had exercised it by declining several years to receive, and by finally receiving, Mr. Onis; and in this instance I thought the Executive ought carefully to preserve entire the authority given him by the Constitution, and not weaken it by setting the precedent of making either House of Congress a party to an act which it was his exclusive right and duty to perform.[20]

Accordingly, Congress may not attempt indirectly, through the use of its spending power, to control the exercise of the President's exclusive right to grant or withhold political recognition. Section 609 is such an attempt; thus, it is an unconstitutional encroachment on the President's power.

## IV.

Because section 609 is, in our view, invalid, we regard it as being without legal force or effect.[21]

The past practice of the executive branch demonstrates its refusal to comply with unconstitutional spending conditions that trench on core Executive powers. Particularly pertinent in this regard is an opinion written in 1960 by Attorney General William Rogers for President Eisenhower concerning such an unconstitutional condition.[22]

Attorney General Rogers' opinion dealt with a provision of a statute that directed that certain expenses of a State Department office be charged to certain appropriations, provided that all documents relating to activities of that office were furnished upon request to Congress. A related statute provided for termination of funds if all documents were not produced, unless the President certified that he had forbidden the disclosure of the documents to protect the public interest. The State Department refused to furnish a number of documents requested by a House subcommittee, and the President certified that he had forbidden their disclosure. The Comptroller General, interpreting the former statute as not incorporating a "public interest" exception permitting the President to withhold the documents from Congress, directed that funds not be made available to liquidate obligations incurred from the following day forward. The Attorney General concluded that the statute should be construed to include a "public interest" exception because, as applied under the circumstances, it would otherwise embody an unconstitutional condition. He based this conclusion in part on the reasoning that:

---

[20] *Quoted in id.* at 216–17.

[21] The invalidity of section 609 does not, of itself, undermine the validity of the Act as a whole, or cause any of its other provisions to fail.

[22] *Mutual Security Program—Cutoff of Funds from Office of Inspector General and Comptroller*, 41 Op. Att'y Gen. 507 (1960) (construing the Mutual Security Act of 1959, 73 Stat. 253).

the Constitution does not permit any indirect encroachment by Congress upon this authority of the President through resort to conditions attached to appropriations such as are contended to be contained in . . . the act. [23]

Further, the Attorney General concluded that "the Comptroller General's view that the proviso . . . has cut off funds under the circumstances disclosed here is an erroneous interpretation of the meaning of this statute," and that "if this view of the Comptroller General as to the meaning of this statute is correct, the proviso is unconstitutional." [24] He stated that, despite the Comptroller General's view that appropriated funds had been cut off, the funds "continue to be available as heretofore." [25]

Accordingly, we conclude that funds elsewhere appropriated in the Act for State Department diplomatic activities abroad may lawfully be obligated or expended for diplomatic relations with the Government of Vietnam if those funds are otherwise available for that purpose, without the President's having to certify that Vietnam has met the conditions purportedly imposed by section 609.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[23] *Id.* at 530.
[24] *Id.*
[25] *Id.* at 531.